DARREN S. ENENSTEIN (SBN 195894)
*dse@enensteinlaw.com*
NED M. GELHAAR (SBN 163185)
*ngelhaar@enensteinlaw.com*
NIMA KAMALI (SBN 294401)
*nkamali@enensteinlaw.com*
JOY LLAGUNO (SBN 311867)
*jllaguno@enensteinlaw.com*
**ENENSTEIN PHAM & GLASS, LLP**
12121Wilshire Boulevard, Suite 600
Los Angeles, California 90025
Tel (310) 899-2070
Fax (310) 496-1930
Attorneys for Plaintiff STEPHEN RUSSELL

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STEPHEN RUSSELL**, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>**NIR MAMAN,** An Individual; **CT707 ISRAELI KRAV SYSTEMS, INC.**, An Ontario Corporation;  **GEORGE AKKELQUIST**, An Individual; **DFW METROPLEX TRAINING ACADEMY,** A New York Entity Form Unknown; And **DOES 1** Through **20**, Inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br>1. **CIVIL RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO); 18 U.S.C. §§ 1961** *et seq.*<br>2. **FRAUDULENT MISREPRESENTATION**<br>3. **CONCEALMENT**<br>4. **FALSE PROMISE**<br>5. **BREACH OF CONTRACT**<br>6. **UNJUST ENRICHMENT**<br>7. **COMMON COUNT**<br>8. **BREACH OF FIDUCIARY DUTY**<br>9. **PROFESSIONAL NEGLIGENCE**<br>10. **UNFAIR COMPETITION; CAL. BUSINESS AND PROFESSIONS CODE § 17200** *et seq.*<br>11. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Stephen Russell ("Plaintiff" or "Russell") hereby complains and alleges against Defendants Nir Maman, CT 707 Israeli Krav Systems, Inc., George Akkelquist (aka George Edmond Abi Abdallah), and DFW Metroplex Training Academy, (hereinafter collectively referred to as "Defendants") as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.      Plaintiff brings this civil action under 18 U.S.C. Section 1961, *et seq.* ("Racketeer Influenced and Corrupt Organization Act" or "RICO"), and federal and state law, to secure temporary, preliminary, and permanent injunctive relief, rescission of contracts, restitution, disgorgement of ill-gotten gains, and for actual, consequential, and exemplary damages, other equitable relief, and all other relief which this honorable Court deems just and proper for the unlawful and egregious acts, omissions and practices by Defendants, and each of them, alleged herein.

2.      Because of his numerous successes as an inventor and technology entrepreneur, Plaintiff Stephen Russell, is internationally recognized for his expertise in facial recognition, computer vision, biometrics, video processing, and artificial intelligence, with business dealings and technology contributions spanning the globe. For his own safety and security, and to protect the often sensitive nature of his business abroad, Russell retained defendants Nir Maman, George Akkelquist, and their respective companies, CT 707 Israeli Krav Systems Inc., and DFW Metroplex Training Academy, for security and investigative services. However, Defendants abused the relationship of trust and confidence arising from their position as security consultants, manipulated Russell, and intentionally fed him false information regarding security threats against him, the safety of his family, and his businesses, in an unlawful scheme to defraud Russell and extort him for upwards of $3 million dollars.

3.      Defendants are engaged in a criminal enterprise to defraud Plaintiff through an unlawful pattern of extortionate acts, false pretenses, fraudulent misrepresentations, and intentional concealment. As described in detail below, Defendants have engaged in these illegal, abusive, and unlawful business practices, with the specific intent to deceive and/or defraud Plaintiff.

4.     Defendants engaged in a pattern of racketeering activity across State lines, and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts, including but not limited to criminal acts of extortion, wire fraud, and mail fraud pursuant to 18 U.S.C. §§ 1341, 1344, 1951, 1961, and Cal. Penal Code §§ 518-520, among other violation of federal and state law, as alleged herein.

**PARTIES**

5.     Plaintiff Stephen Russell is, and at all material times mentioned herein, an individual residing in the County of San Francisco in the State of California.

6.     Defendant Nir Maman, upon information and belief, is and at all material times mentioned herein, an individual residing in Toronto, Canada, and is a citizen of Canada, and is and was at all material times mentioned herein doing business in the State of California.

7.     Defendant George Akkelquist (aka George Edmond Abi Abdallah), upon information and belief, is and at all material times mentioned herein was, an individual residing in the State of Hawaii, and is and was at all material times mentioned herein, doing business in the State of California.

8.     Plaintiff is informed and believes, and thereon alleges that Defendant CT 707 Israeli Krav Systems, Inc., is and at all material times mentioned herein was, a corporation organized and existing under the laws of Ontario, Canada, with its principal place of business addressed at 800 Steeles Ave. West, Unit B-10, Suite 178, Thornhill, Ontario, L4J 7L2, Canada, and is and was at all material times mentioned herein doing business in the State of California.

9.     Plaintiff is informed and believes, and thereon alleges that Defendant DFW Metroplex Training Academy, at all material times mentioned herein, is an unincorporated entity with its principal place of business located at 8205 Camp Bowie West Boulevard, #104, Fort Worth, Texas 76116, and is and was at all material times mentioned herein doing business in the State of California.

10.     Plaintiff does not presently know the names and capacities of the defendants sued herein as Does 1 through 20, inclusive. Plaintiffs will seek leave of court to amend this Complaint to allege said defendants' true names and capacities as soon as Plaintiffs ascertain them.  Each of

the Doe defendants is responsible in some manner for the occurrences herein alleged and for Plaintiffs' damages.

11.    Plaintiffs are informed and believe and thereon allege that, at all times herein alleged, each of the Defendants named in these claims was not a resident of the State of California and was the agent, employee, partner, co-venturer, and/or co-conspirator of each of the remaining Defendants, and, in doing the things herein alleged, was acting within the course and scope of such agency, employment, partnership, venture, and/or conspiracy, each with the permission, consent, or ratification of each of the other Defendants.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs. The parties are citizens of different States as Plaintiff is a citizen of California and at least one or more defendants are a citizen of Canada according to 28 U.S.C. § 1332(c)(1). Furthermore, this Court has subject matter jurisdiction under 28 U.S.C. § 1331 as Plaintiff brings claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.,* and the remaining claims in this action form part of the same case and controversy pursuant to 28 U.S.C. §1367.

13.    This Court has personal jurisdiction over Defendants because the intended effects of the conduct of Defendants, and each of them, were expressly directed at Plaintiff, a resident of California, and, in fact, occurred and caused harm to Plaintiff in the State of California.

14.    Venue for this action is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c) because a substantial part of the activities and events alleged herein occurred, were intended to, and did, cause effects within this District, and a substantial part of the injury took place and continues to take place, in this District.

## COMMON ALLEGATIONS

15.    Stephen Russell is a successful inventor and technology entrepreneur, with expertise in computer vision, biometrics, video processing, and artificial intelligence. He is the inventor on over a dozen patents, including patents concerning facial recognition technology, and is an active investor, advisor, and board member at several companies. Russell is the founder and

CEO of Prism AI, a video intelligence and analytics platform, and his former company, 3VR has provided facial recognition devices and software to government agencies throughout the United States, Russia, and Ukraine.

16.     In or around the Fall of 2016, Russell traveled to Kiev, Ukraine to set up research and product development offices for Ring Labs, a technology security company where he served on the Board of Directors.

17.     Soon thereafter, Russell travelled to Nantucket, Massachusetts.  When Russell returned to San Francisco, it appeared his home had been broken into. The power was off at the main breaker and the hinges appeared to have been removed.

18.     Russell was concerned about his security, particularly in light of his recent business dealings in Ukraine and Russia. As a result, Russell hired a private investigator, Steve Gudelj, who suggested Russell might be being followed.

19.     In or around October 2017, Russell contacted Ryan Micheletti, owner and operator of Shield Corps Security in California. Micheletti then connected Russell to Tom Lafanier of Dynasec International, a security company that specializes in private investigations.

20.     In or around January 2018, Dynasec International began providing Russell with 24-hour security personnel, which culminated in the finding of an odd-looking device in an electrical outlet in Russell's home. The electrical outlet was sent off for analysis and a video of the suspected device was sent to Micheletti. Micheletti then introduced Russell to defendant George Akkelquist of DFW Metroplex Training Academy ("DFW Metroplex"), a purported expert in Countering Violent Extremists ("CVE").

21.     On DFW Metroplex's website, Akkelquist purports to have over forty (40) years of experience mitigating the "current Global Extremism threat present and active on every continent." Akkelquist further claims to have served as a consultant who has worked with the U.S. Federal Bureau of Investigation ("FBI"), U.S. Central Intelligence Agency ("CIA"), and U.S. Army, among other government organizations.

22.     Akkelquist was sent the video of the suspected device and asked to determine its nature and origin.  On information and belief, Akkelquist was made aware of Russell's existing

concerns about his security relating to his business dealings in Ukraine.  After purportedly analyzing the video, Akkelquist reported to Russell that the plug appeared to be a surveillance device of Russian origin. Akkelquist's assertion fueled Russell's concerns about his business dealings in Russia and Ukraine, and based on Akkelquist's representations and his purported background, experience, and contacts with the FBI and CIA, Russell retained Akkelquist as a security adviser to help him navigate what Akkelquist represented was Russell's complex and dangerous security situation.

23.    Towards the end of January 2018, Akkelquist introduced Russell to defendant Nir Maman, owner and operator of defendant CT 707 Israeli Krav Systems, Inc., ("CT 707, Inc.") and convinced Russell to retain Maman as an additional security consultant. Maman also made certain representations to Russell regarding his purported experience and background in security and counter-terrorist investigations, including but not limited to, being a high-ranking officer of Mossad, the national intelligence agency of Israel, and an eminent officer of the Toronto Police Department.

24.    Both Akkelquist and Maman represented to Russell that he was in great danger from unnamed international threats.  Based on these assertions, Russell retained both Akkelquist and Maman for investigative services and security.

25.    Upon information and belief, neither Maman, Akkelquist, nor their respective companies were licensed by the California Department of Consumer Affairs Bureau of Security and Investigative Services ("BSIS") to provide investigative and/or security services.

26.    In or around February 2018, Akkelquist, and Maman, purportedly through their respective companies, CT 707, Inc., and DFW Metroplex began performing security and investigative services for Russell through Micheletti's Shield Corps Security. Upon information and belief, the arrangement was for Shield Corps Security to bill Russell directly because of its valid license to provide security and investigative services in California. Upon information and belief, Shield Corps Security would then pay Maman, Akkelquist, and/or their respective companies, for the investigative and security services.

27.    Akkelquist and Maman stoked Russell's fears by repeatedly confirming to him that

his security issues were connected to Russell's previous business relationships with international organizations and U.S. government agencies. They both represented to Russell that he was being followed and surveilled, and that this was connected to the sensitive nature of the computer vision and facial recognition technology being implemented across several international projects during his time working with 3VR, In-Q-Tel (a tech venture fund that partners with the CIA, NSA, and other national security agencies), the Moscow Subway Project, and his recent work with Ring Labs setting up offices in Ukraine. Both Akkelquist and Maman claimed to independently verify that there were active security threats against Russell.

28.     The highly specific and detailed nature of the information Maman and Akkelquist provided, including confidential details relating to Russell's prior business dealings, made their claims seem highly credible to Russell. According to Maman and Akkelquist, Russell was on a "list" created by the Russian government and there was an active investigation against Russell because of the business he had conducted in Russia and Ukraine.

29.     According to Maman and Akkelquist, it was necessary for Russell to engage numerous investigators and security personnel to conduct the complex investigations of the security threats they had identified, and to provide sufficient security to protect against these threats.

30.     On or around February 2, 2018, Maman and/or Akkelquist sent Russell's accountants an invoice and "itemized break-down," upon information and belief, via Micheletti, for the purported security and investigative services. The invoice charged Russell for a 14-day Retainer in the amount of $126,000, and a $9,000 daily fee amounting to $270,000 per thirty (30) days, with the representation that the money charged would go toward services, including but not limited to, four (4) "executive protection agent" guards, one (1) 24/7 on-call manager, and Armed Executive Protection Insurance, among other costs.

31.     However, upon information and belief, Maman and Akkelquist merely subcontracted with two local security services providers, Albert Timen and Ronen Shlomo. Russell never saw any other security personnel.

32.     On or around February 7, 2018, Akkelquist sent Russell's accountants an invoice

from DFW Metroplex for $13,000 for certain services, including but not limited to, "threat assessment," "close consulting" and "close personal security" services, and an additional invoice for a $15,000 retainer fee for the period of February 7, 2018 through March 7, 2018.

33.     On or around February 12, 2018, Akkelquist sent Russell another invoice for an additional $100,000 Retainer for the period of April through December, per a purported "agreement with Mr. Steve Russell on February 10."

34.     Thereafter, Maman and Akkelquist repeatedly told Russell that he was at risk from foreign threats, and that he needed to continue to pay them for additional security services or his life, the lives of his family, and his businesses would be in danger.  They further represented that others around Russell were potentially working against his interests, including members of his former security teams.  Upon information and belief, Maman and Akkelquist did so to increase Russell's fear and vulnerability, and to isolate him so that he would only trust them.

35.     In or around March, 2018, Akkelquist and Maman urgently insisted that Russell needed to leave his home and travel to a safe location in Hawaii because his life was in immediate danger. To manipulate and create fear in Russell, Akkelquist and Maman represented that they had received intelligence that various foreign entities were plotting to harm him. Akkelquist insisted that Russell stay at Akkelquist's home in Hawaii, thereby increasing his control and influence over him.  During this time, Akkelquist tried to convince Russell to assign certain intellectual property rights of Russell's company, Prism Sky Labs, to Akkelquist's company, Vallation Security, stating that doing so was necessary to protect Russell's security. Russell hesitated in doing so, but continued to suffer fear and anxiety caused by these dire warnings from his trusted—and supposedly knowledgeable—security team.

36.     When they returned from Hawaii, Maman and Akkelquist again represented to Russell that his life was in danger, and that Russell needed to move again, this time to Redwood City.

37.     Both Maman and Akkelquist represented to Russell that according to their connections with the Russian intelligence community, there were contracts out on Russell's life and plans to steal his intellectual property. They further represented to Russell that Vladimir

Starov, the CEO of Galfort, a Russian security company, had targeted Russell because of his current business dealings in Ukraine. They also represented that the FBI and CIA had ongoing counter intelligence investigations against him.

38.     From in or around February 2018 through April 2018, Both Akkelquist and Maman continued sending Russell invoices through email for their purported services to investigate and protect Russell from the alleged threats against him. Under duress, in fear for his safety, and with the threat of severe economic loss to his businesses— all created by the representations of Maman and Akkelquist— Russell authorized each payment in full. The invoices from this period totaled approximately $761,772.37.

39.     Attached hereto as **Exhibit A** are true and correct copies of seven (7) Shield Corps Security invoices charged to Plaintiff for the purported security and investigative services from the period of in or around February 2018 through April 2018, totaling $465,772.37. Attached hereto as **Exhibit B** are true and correct copies of four (4) DFW Metroplex Training Academy invoices charged to Plaintiff for the purported security and investigative services from the period in or around February 2018 through April 2018, totaling $296,000.

40.     On or around March 27, 2018, Akkelquist sent Russell an invoice and on or around March 28 2018, a corresponding wire transfer request for an additional $168,000 retainer fee, which Russell paid to DFW Metroplex in full.

41.     Maman also continued to tell Russell that he was in danger and charged for additional security services. On or around April 12, 2018, Maman proposed a $200,000 per month security contract, with a one-year term in fine print. Attached hereto as **Exhibit C** is a true and correct copy of the proposed security contract, dated April 12, 2018.

42.     Maman further proposed varying numbers that Russell must spend on additional security services to protect himself, including but not limited to, a proposal of $10 million on cyber security.  Ultimately, on or around March 29, 2018, Maman sent an additional invoice to Russell's accountants for $1 million with fine print on the invoice for an additional $2 million, secured against Russell's Uber shares. Attached hereto as **Exhibit D** is a true and correct copy of

the invoice for $1 million dollars from CT 707 Inc., dated March 29, 2018. On or around April 4, 2018, Russell's accountants wired Maman the requested $1 million dollars to TD Bank in Ontario, Canada with CT 707 Israeli Krav Systems Inc. as beneficiary.

43.     Shortly following the wire transfer, Russell learned that Akkelquist made fraudulent representations about his FBI and CIA background, and that Maman had made similarly fraudulent claims about his background and experience. Russell also learned that both Maman and Akkelquist had lied about the size and nature of their security services.

44.     In or around April 2018, upon his realization that both Maman and Akkelquist had been making fraudulent statements, and further being informed by his investment manager of the contracts' terms in fine-print, Russell realized that Maman and Akkelquist were intentionally defrauding him. Russell immediately asked for the money from the security contract, upwards of $1 million that Russell had paid, to be returned. Russell also demanded an accounting and a report of the security activities from Maman and Akkelquist.

45.     However, Maman represented to Russell that it was too late because the money had already gone to an Israeli intelligence cyber group. In text messages to Russell on or around April 24, 2018, Maman represented, "[a]ny money you have paid has been for services you requested and that has been delivered to date." Additionally, Maman texted Russell in a threatening manner, "[y]ou're not making a wise decision with any of this Steve."

46.     Although there was no contract or written agreement, Maman claims that he is owed $ 3 million dollars for the alleged "intel operation."

47.     In text messages in or around April 2018, Akkelquist also represented to Russell that, "[t]here are no unused funds" and that all the money Russell paid was put toward the requested services. Akkelquist further threatened, "[l]astly, I'm telling you this right now Steve, you are driving yourself to the ground, you're making all the wrong moves right now, you are walking yourself into the lion's den." Akkelquist also texted Russell in or around April, 2018, that he would "need a final report from us to document the last three months plus everything we factually found for you," regarding the alleged active threats against Russell. However, Akkelquist refused to release any report or accounting of their services without full payment.

48.     On or around May 1, 2018, Akkelquist sent a text message to Russell stating, "[w]e continue to receive alarming reports through the intelligence network about the characters we've been investigating. I believe this will lead to a favorable report as it confirms the existence of threats that you have been facing. This info needs to be shared in person and cannot be shared in a text."

49.     Upon information and belief, the electrical outlet Akkelquist claimed to contain a covert surveillance device that appeared to be of Russian origin, was in fact not a covert surveillance device.

50.     To date, Defendants have refused to provide any accounting of the security and investigative services purportedly performed, and continue to refuse to refund any of the fraudulently obtained sums of upwards of 1.7 million dollars paid by Russell in reliance of Defendants' egregious misrepresentations of active threats against his safety, the safety of his family, and the security of his businesses.

51.     As a result of Defendants' fraudulent misrepresentations, Russell has paid approximately over two million dollars ($2,000,000) for security and protective services in his efforts to protect himself, his family, and his businesses against the purported active and imminent threats fraudulently alleged by Defendants' unlawful scheme.

## FIRST CLAIM FOR RELIEF

**CIVIL RACKETERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"); 18 U.S.C. § 1962 *et seq.***

### Against All Defendants

52.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

53.     Each Defendant is a RICO "person," as defined in 18 U.S.C. § 1961.

54.     Defendants CT 707 Krav, Inc. and DFW Metroplex are RICO "enterprises," as defined in 18 U.S.C. §§ 1961(4) and 1962, which were and are engaged in activities affecting interstate commerce at all times relevant to this Complaint.

55.     Further, there is a broader enterprise (the "Broader Enterprise") that consists of an

11

association-in-fact of members, including but not limited to Defendants Maman, Akkelquist, CT 707 Krav, Inc., and DFW Metroplex, who have functioned for years as a continuing unit for the common purpose of achieving the activities herein alleged, including but not limited to, obtaining commercial advantage and private financial gain via false pretenses, fraud, and extortion, over unsuspecting victims unaware of their fraudulent acts and misrepresentations. Defendants' activities described herein have obstructed, delayed, or otherwise affected interstate commerce.

56.     Defendants agreed to and did conduct and participate in the conduct of the Enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding and extorting Plaintiff.

57.     The predicate acts constituting the pattern of unlawful activity engaged in by Defendants, as described herein, constitute:

   a.  Extortion, as defined in 18 U.S.C. § 1961(1)(A) and (B), including but not limited to violations of Cal. Penal Code §§ 518-520 and §§ 523-524;

   b.  Mail fraud, as defined in 18 U.S.C. § 1961(1)(B), for violations of 18 U.S.C. §1341;

   c.  Wire fraud, as defined in 18 U.S.C. § 1961 (1)(B), for violations of 18 U.S.C. § 1343; and

   d.  Interference with commerce by extortion, as defined in 18 U.S.C. § 1961 (1)(B), for violations of the Hobbs Act, 18 U.S.C. § 1951, wherein Defendants deliberately sought to obtain property from Plaintiff by putting him in reasonable fear for his safety, the safety of his family, and fear of economic loss.

58.     All of the predicate acts described herein were related in that they had the common purpose to manipulate and create fear in Plaintiff through threats against his safety, the safety of his family, and fear of severe economic loss, with the intent to deceive and defraud Plaintiff and thereby receive continued payments for purported security and investigative services.

59.     All of the predicate acts described herein were continuous so as to form a pattern of racketeering activity in that Defendants engaged in the predicate acts over a substantial period

of time and such predicate acts have become the Defendants' regular way of conducting business, and these unlawful business practices will continue indefinitely into the future unless restrained by this Court.

60.    Defendants together conspired, agreed, intended, adopted and/or conducted the goal of furthering or facilitating, that income, in the form of payments for purported security and investigative services induced from Plaintiff via extortion, threats, false pretenses, fraudulent misrepresentations, wire fraud, and mail fraud, would be received by Defendants, and such income would be derived, directly or indirectly, from a pattern of activity unlawful under 18 U.S.C. § 1961, in which Defendants participated as principals, namely multiple, repeated, and or continuous predicate acts as alleged above.

61.    In violation of 18 U.S.C. § 1962 (a), an objective of Defendants' conspiracy was and is that income, or the proceeds of such income, would be used and invested in the operation of CT 707 Inc., DFW Metroplex, and the Broader Enterprise (hereinafter, collectively "the Enterprises") for illegitimate purposes, including the fraudulent threats inducing payment from Plaintiff, and conducting the extortionate campaign against Plaintiff, affecting interstate commerce.

62.    In violation of 18 U.S.C. § 1962 (b), Defendants Maman and Akkelquist, together conspired, agreed, intended, and/or adopted the goal of furthering or facilitating to acquire or maintain, directly or indirectly, an interest in or control of the Enterprises through a pattern of unlawful activity under 18 U.S.C. § 1961, in which Defendants participated as principals, namely the multiple repeated, and/or continuous predicate acts as alleged above.

63.    In violation of 18 U.S.C. § 1962 (c), Defendants were and are associated with the Enterprises and have conducted and/or participated directly, or indirectly in the conduct of the Enterprises' affairs, including but not limited to, in the management and operation of the affairs of the Enterprises, through a pattern of unlawful activity under 18 U.S.C. § 1961, namely multiple repeated, and or continuous predicate acts as alleged above.

64.    Plaintiff sustained injury to his property and/or business by reason of Defendants' violations of 18 U.S.C. §§ 1961 *et seq.*

65.     As a direct and proximate result of, and by reason of Defendants' racketeering activity, Plaintiff has suffered substantial injury, including but not limited to, the more than $1.7 million dollars paid to Defendants under false and fraudulent pretenses, and extortionate acts. As a result of Defendants' egregious and criminal conduct, Plaintiff is entitled to recover treble the damages he has sustained together with the cost of this suit, including reasonable attorney fees.

## SECOND CLAIM FOR RELIEF

### FRAUDULENT MISREPRESENTATION

### Against All Defendants

66.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

67.     As described in detail above, Defendants made numerous false representations to Plaintiff, including but not limited to, representing to Plaintiff that there were grave, imminent, and active threats to his security, the security of his family, and to his business. Defendants further represented that to protect against these threats, it was necessary for Plaintiff to retain Defendants and pay sums totaling upward of $1.7 million dollars to conduct complex investigations, and provide extensive security to protect against these threats. Defendants intentionally made false claims regarding their background and experience in order to fraudulently induce payment by Plaintiff.

68.     Defendants made false representations regarding the extent, scope, and true cost of the actual security and investigative services provided. Defendants also represented to Plaintiff that they would perform specific work when in fact such representations were false when made, including without limitation, because they each had no such intention.

69.     Defendants knew that these representation were false and were made for the purpose of creating fear in Plaintiff so that he would continue to make payments for Defendants' purported services. Plaintiff reasonably relied on Defendants' fraudulent misrepresentations.

70.     As a direct result of Defendants' intentional misrepresentations, Plaintiff has suffered general, special, consequential, incidental, and compensatory damages. As a result, Defendants are liable to Plaintiff for his losses in an amount to be determined at trial.

14

COMPLAINT

71.    In doing the acts herein alleged, Defendants, and each of them, acted fraudulently, willfully, maliciously, presently and with callous disregard of Plaintiff's rights, and interest in Plaintiff's property, subject Defendants to punitive damages, according to proof at trial.

**THIRD CLAIM FOR RELIEF**

**CONCEALMENT**

**Against All Defendants**

72.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

73.    As alleged herein, Plaintiff retained Defendants to provide competent and truthful security assessments, investigative services, and security to Plaintiff and Defendants had a duty to disclose all material facts regarding the contracted for services. Defendants intentionally concealed certain material facts to Plaintiff, including but not limited to, accurate and truthful information regarding Defendants' background and experience relevant to security and investigations, accurate and truthful assessments of the existence of security threats against Plaintiff, and the scope, extent, and cost of the security and investigative services actually provided. Defendants' failure to disclose these facts made their disclosure deceptive.

74.    Had Defendants truthfully and accurately disclosed the information alleged above, Plaintiff would have not retained and continued to retain their purported security and investigative services, and would not have paid the sums to Defendants for their purported security and investigative services.

75.    As a result of Defendants' fraudulent concealment, Plaintiff has lost over $1.7 million dollars in payments to Defendants, and further special, consequential, incidental, and compensatory damages. As a result, Defendants are liable to Plaintiff for his losses in an amount to be determined at trial.

76.    In doing the acts herein alleged, Defendants, and each of them, acted fraudulently, willfully, maliciously, presently and with callous disregard of Plaintiff's rights, and interest in Plaintiff's property, subject Defendants to punitive damages, according to proof at trial.

## FOURTH CLAIM FOR RELIEF

### FALSE PROMISE

### Against All Defendants

77.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

78.     As alleged above, Defendants made certain promises to Plaintiff, including but not limited to, the promise to provide truthful and competent security and investigative services to Plaintiff. Defendants did not intend to perform these promises when Defendants made them, and Plaintiff reasonably relied on Defendants' promises.

79.     Defendants did not perform the promised acts and Plaintiff suffered harm. As a result of Defendants' false promises, Plaintiff has lost over $1.7 million dollars in payments to Defendants, and further special, consequential, incidental, and compensatory damages. As a result, Defendants are liable to Plaintiff for his losses in an amount to be determined at trial.

80.      In doing the acts herein alleged, Defendants, and each of them, acted fraudulently, willfully, maliciously, presently and with callous disregard of Plaintiff's rights, and interest in Plaintiff's property, subject Defendants to punitive damages, according to proof at trial.

## FIFTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

### Against All Defendants

81.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

82.     As set forth above, Defendants, and each of them, engaged in binding express and/or implied-in-fact contracts with Plaintiff, to provide security and investigative services to Plaintiff, in exchange for payment from Plaintiff.

83.     Plaintiff performed all obligations required of him under the contracts, and made payments to Defendants for the security and investigative services, as provided for in the express and/or implied-in-fact agreements.

84.     Defendants, and each of them, breached the agreements with Plaintiff by failing to

16

provide the contracted for security and investigative services.

85.    As a direct and proximate result of Defendants' breaches, Plaintiff has been damaged in an amount to be determined at trial, in excess of $1,000,000.

86.    As a result of Defendants' breaches, Plaintiff has lost over $1.7 million dollars in payments to Defendants, and further special, consequential, incidental, and compensatory damages. As a result, Defendants are liable to Plaintiff for his losses in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

#### Against All Defendants

87.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

88.    As a direct result of Defendants' unlawful conduct as set forth above, Defendants were unjustly enriched.

89.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been monetarily damaged in an amount to be determined at trial. Defendants are liable to Plaintiff for his losses, including but not limited to disgorgement of all revenues, earnings, profits, compensation, and benefits obtained by Defendants as a result of their unfair, unlawful, and fraudulent acts and practices.

90.    In doing the acts herein alleged, Defendants, and each of them, acted fraudulently, willfully, maliciously, presently and with callous disregard of Plaintiff's rights, and interest in Plaintiff's property, subject Defendants to punitive damages, according to proof at trial.

## SEVENTH CLAIM FOR RELIEF

### COMMON COUNT

#### Against All Defendants

91.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

92.    As set forth above, Defendants engaged in a course of conduct as a part of a plan,

scheme, and design to cheat, defraud and extort money from Plaintiff. Defendants received money that was intended to be used for the benefit of Plaintiff, by way of providing competent and truthful security assessments, investigative services, and security services to Plaintiff. The money paid by Plaintiff was not used for the benefit of Plaintiff and Defendant has not refunded the money to Plaintiff.

93.     Had Plaintiff known the true facts and intent of Defendants, he would not have retained and continued to retain their services, and would have not made and continued to make payments to Defendants.

94.     As a result of Defendants' fraudulent and unlawful acts, Plaintiff has lost over $1.7 million dollars in payments to Defendants, and further special, consequential, incidental, and compensatory damages. As a result, Defendants are liable to Plaintiff for his losses in an amount to be determined at trial.

95.      In doing the acts herein alleged, Defendants, and each of them, acted fraudulently, willfully, maliciously, presently and with callous disregard of Plaintiff's rights, and interest in Plaintiff's property, subject Defendants to punitive damages, according to proof at trial.

## EIGHTH CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

### Against All Defendants

96.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

97.     As set forth above, Defendants breached their fiduciary duties as security consultants and violated their relationship of trust and confidence owed to Plaintiff, by fraudulently misrepresenting material facts, including but not limited to, fraudulent misrepresentations and/or concealments regarding their background and experience, the existence of imminent security threats against Plaintiff, and the scope, extent, and true cost of the actual services provided to Plaintiff. Defendants further breached their fiduciary duty by disclosing false and fraudulent information to third parties, and by conducting the extortionate acts as set forth above.

98.     As a direct and proximate result of Defendants' breaches of fiduciary duties, Plaintiff has suffered damages, including but not limited to special, general, consequential, incidental, and compensatory damages. As a result, Defendants are liable to Plaintiff for his losses in an amount to be determined at trial.

99.     In doing the acts herein alleged, Defendants, and each of them, acted fraudulently, willfully, maliciously, presently and with callous disregard of Plaintiff's rights, and interest in Plaintiff's property, subject Defendants to punitive damages, according to proof at trial.

**NINTH CLAIM FOR RELIEF**

**PROFESSIONAL NEGLIGENCE**

**Against All Defendants**

100.     Plaintiffs realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

101.     As set forth above, Defendants assumed the responsibility as retained security professionals and consultants, who were entrusted to truthfully and competently provide security and investigative services to Plaintiff.

102.     Defendants, and each of them, failed to use reasonable care by, among other things, failing to truthfully disclose material facts to Plaintiff, making fraudulent representations to Plaintiff, and engaging in extortionate conduct against Plaintiff, as set forth above.

103.     As a direct and proximate result of Defendants' actions and/or failure to act, Plaintiff has suffered damages, including but not limited to special, general, consequential, incidental, and compensatory damages. As a result, Defendants are liable to Plaintiff for his losses in an amount to be determined at trial.

104.     In doing the acts herein alleged, Defendants, and each of them, acted fraudulently, willfully, maliciously, presently and with callous disregard of Plaintiff's rights, and interest in Plaintiff's property, subject Defendants to punitive damages, according to proof at trial.

**TENTH CLAIM FOR RELIEF**

**UNFAIR COMPETITION; VIOLATION OF BUSINESS AND PROFFESIONS**

**CODE §§ 17200 *et seq.***

**Against All Defendants**

105.     Plaintiffs realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

106.     As set forth in detail above, Defendants' conduct constitutes unfair, unlawful and/or fraudulent business acts or practices under California Business and Professions Code §§ 17200 et seq., including but not limited to, committing illegal and extortionate acts in violation of Cal. Penal Code §§ 518-520, violations of Civil RICO pursuant to 18 U.S.C. §§ 1962 *et seq.*, engaging in the predicate acts of wire fraud in violation of 18 U.S.C. § 1343, mail fraud in violation of 18 U.S.C. § 1341, and interference with commerce through extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 , and making numerous fraudulent misrepresentations and intentional concealments, among other unlawful and deceptive practices alleged herein.

107.     As a direct and proximate result of Defendants' unlawful and deceptive business practices, Plaintiff has suffered damages, including but not limited to special, consequential, incidental, and compensatory damages. As a result, Defendants are liable to Plaintiff for his losses in an amount to be determined at trial.  Plaintiff is entitled to disgorgement of all revenues, earnings, profits, compensation, and benefits obtained by Defendants as a result of their unfair, unlawful, and fraudulent business acts and practices.

**ELEVENTH CLAIM FOR RELIEF**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Against All Defendants**

108.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

109.    Defendants' wrongful actions as alleged herein in engaging, constituted extreme and outrageous conduct, including but not limited to, fraudulent misrepresentations regarding active threats against the safety and security of Plaintiff, his family, and his business, extortionate threats against Plaintiff's reputation if the outrageous sums demanded by Defendants were not paid, and a campaign to defame Plaintiff and publicly impugn his character.

110.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered damages, including but not limited to suffering anguish, distress, nervousness, worry, and shock. As a result, Defendants are liable to Plaintiff for his losses and general damages in an amount to be determined at trial.

111.    In doing the acts herein alleged, Defendants, and each of them, acted fraudulently, willfully, maliciously, presently and with callous disregard of Plaintiff's rights, and interest in Plaintiff's property, subject Defendants to punitive damages, according to proof at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, jointly and severally, as follows:

1.    For compensatory damages, the exact amount to be determined at trial.

2.    For special damages, according to proof;

3.    For general damages, the exact amount to be determined at trial;

4.    For treble the damages sustained by Plaintiff, including but not limited to, the costs of investigation, the costs of this suit, and reasonable attorney's fees, pursuant to 18 U.S.C. § 1964 (c), together with pre- and post-judgment interest, against all Defendants in violation of 18 U.S.C. § 1962.

5.    For equitable relief, as may be appropriate, in accordance with 18 U.S.C. § 1964 (a);

6.    For punitive damages according to proof in an amount to be determined by this Court and sufficient to punish Defendants and deter them and others from similar wrongful conduct;

7.    For attorney's fees and costs of suit incurred in connection with this action;

8.    For all other equitable relief, including disgorgement by Defendants of all sums obtained pursuant to the unlawful conduct described herein.

9.    For such other and further relief as the Court deems just and proper.

DATE:  November 2, 2018                    ENENSTEIN PHAM & GLASS

                                          BY:   _____
                                          Darren S. Enenstein, Esq.
                                          Ned M. Gelhaar Esq.
                                          Joy D. Llaguno, Esq.
                                          Attorneys for Plaintiff Stephen Russell

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff Stephen Russell hereby demands a trial by jury for all claims and causes of action for which a right to trial by jury exists.

DATE:  November 2, 2018          ENENSTEIN PHAM & GLASS

                              BY:   _____
                                   Darren S. Enenstein, Esq.
                                   Ned M. Gelhaar, Esq.
                                   Joy D. Llaguno, Esq.
                                   Attorneys for Plaintiff Stephen Russell

1