UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEPHEN RUSSELL,

           Plaintiff,

    v.

NIR MAMAN, et al.,

           Defendants.

Case No. 18-cv-06691-RS

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The facts of this case read like a Tom Clancy novel, and the docket reads like a fact pattern written by a civil procedure professor. Stephen Russell is an investor and entrepreneur. Upon returning from a business trip to Ukraine, he discovered his house had been broken into. He hired several security consultants, who told him there was an eavesdropping device in an electrical outlet. They stoked his fears about various baroque threats, and he paid them handsomely for investigation and protection. The principal security personnel were Ryan Micheletti, George Akkelquist, and Nir Maman. After Maman sent Russell an invoice with a $2 million charge to which he had not agreed, he became concerned he was being bilked. So, he did some digging of his own and decided they had lied about their experience, the threats to him, and the services they had provided. He sued them and several associated parties; Maman filed a counterclaim against him and a third-party complaint against his subcontractor, Ronen Shlomo; Shlomo, for his part, filed a crossclaim against Russell for services he provided after Russell fired Maman. Now, a party associated with Akkelquist, DFW Metroplex Training Academy, brings a motion for

1  summary judgment ("MSJ") against Russell, and Shlomo moves for judgment as third-party
2  defendant against Maman and as cross-complainant against Russell. The latter two motions are
3  unopposed; not by stipulation but by silence. (Russell and Maman's counsel also made oral
4  representations that their clients did not oppose the motions.) For the reasons further set out below,
5  both DFW's and Shlomo's motions are granted in full.

**II. BACKGROUND**

7  Untangling the knotty tapestry of this case requires proceeding in several parts. First,
8  Russell's claims are outlined. Then, a brief procedural history follows. Finally, the roles of DFW
9  and Shlomo are fleshed out, as they bring the motions at issue in this order.

10  **A.  Russell's Initial History with the Defendants**

11  Stephen Russell thought he was in danger. Russell is an entrepreneur, selling—among
12  other ventures—facial recognition technology around the world, thanks in part to investments
13  from the CIA-backed fund In-Q-Tel. Third Amended Complaint ("TAC") at 6. (The rest of this
14  subsection draws from the TAC, as the facts in this subsection are either not in dispute or are only
15  relevant as general background for the motions decided in this order.) He was also an early
16  investor in Uber. After a business trip to Ukraine in 2016, he came back to find his San Francisco
17  home had been broken into. He hired a private investigator, who suggested he might be under
18  surveillance. In late 2017, Russell hired a security consultant, Ryan Micheletti, the owner of
19  Legion Industries, Inc., d/b/a/ Shield Corps Security. Micheletti told Russell to contact Dynasec
20  International, which he then hired to provide around-the-clock security personnel. In January
21  2018, a Dynasec employee found an "odd-looking device in an electrical outlet in Russell's
22  home." TAC at 6. Micheletti then connected Russell with George Akkelquist.
23  Akkelquist represented himself as an expert in Countering Violent Extremists. He had a
24  biography on the website of DFW Metroplex Training Academy. (Russell understood DFW to be
25  linked to Akkelquist's services as a security consultant, which it disputes. DFW is a firearms and
26  security training operation in the Dallas Fort-Worth Area, described further below.) Akkelquist's
27  biography on its site touted his experience working with the FBI, special forces in the US military,

United States District Court
Northern District of California

1   the Foreign Legion, and other agencies. (Later, Akkelquist tried to bolster these claims by showing

2   Russell photos of him supposedly working with the CIA in Nicaragua, and receiving a medal from

3   FBI Director Robert Mueller, although Russell later came to believe the Mueller photo was simply

4   from a meet-and-greet after a conference.) Akkelquist told Russell he thought the object was a

5   Russian-made surveillance device, likely linked to the Russian mob, and placed there because of a

6   business dispute. Russell hired Akkelquist to consult on his seemingly complicated and

7   threatening security risks.

8         Also in January 2018, Akkelquist introduced Russell to Nir Maman and his company

9   CT707 Israeli Krav Systems, Inc. Akkelquist described Maman as his "right-hand man." Maman

10   said he was employed by the Toronto Police Department but also had experience as a high-ranking

11   officer in Mossad. Russell hired Maman to provide security services, such as "close physical

12   protection": in other words, four bodyguards. To that end, Maman subcontracted with individuals

13   including Ronen Shlomo and his company Bsecure. Only two bodyguards were provided. (Thus,

14   Russell ended up relying on five separate security providers: Dynasec, and a chain consisting of

15   Micheletti/Shield, Akkelquist/DFW, Maman/CT707, and Shlomo/Bsecure, with the hierarchy

16   roughly mirroring that order, although only Maman and Shlomo had a direct subcontractor

17   relationship.)

18         Maman and Akkelquist told Russell his life was in danger from threats as varied as

19   Russian mobsters and Mexican drug cartels. They told him the CIA had initiated a counter-

20   intelligence investigation against him because of his supposed links to the Russian government;

21   that a Russian had put out a hit on him for pulling out of a facial-recognition project; and that his

22   business colleagues were attempting to take over his company. They told him he was being

23   followed, and in March 2018 they told him there was an imminent threat to his life, so they urged

24   him to flee to Akkelquist's home in Hawaii, which he did. While there, Micheletti, Maman, and

25   Akkelquist tried to convince him to assign intellectual property to a company with which they

26   were associated, for safe keeping. They investigated various people who were supposedly part of

27   these threats.

28

1    Russell paid them through Micheletti and his company, and also paid Akkelquist through

2    DFW. Over the course of February and March 2018, Russell sent them nearly $1 million. Maman

3    outlined options for additional security going forward, including one that would have spent $10

4    million on cybersecurity alone, or a $200,000 per month security contract. Eventually, Russell

5    agreed to a $1 million retainer for future services. Maman sent an invoice for this in late March,

6    and Russell sent the payment in April 2018.

7    **B.  Russell's Suspicions of Fraud**

8    After sending the payment, Russell's investment manager realized the invoice called for an

9    additional $2 million payment to be sent after the $1 million retainer. According to Maman, this

10   was merely a reference to an existing oral contract for $3 million for investigative services (in

11   addition to other multimillion contracts for security services). This would be payable at $200,000

12   per month and had no early termination agreement. Third-Party Complaint, ¶ ¶ 13–15. The $2

13   million would be secured by Russell's pre-IPO shares in Uber. Russell, on the other hand, felt this

14   contradicted what they had discussed, and began to distrust his security staff.

15   Russell re-investigated Maman's and Akkelquist's qualifications, and found them to be

16   exaggerated. He came to feel they had also over hyped the threats he faced and the work they had

17   done for him. When Russell asked for his money back, they refused, saying the funds had already

18   been committed. He fired his consultants, except for Shlomo, as discussed below. Maman

19   continued to insist he was owed millions for the security services he had provided.

20   **C.  Procedural History**

21   Russell sued Micheletti, Maman, Akkelquist, and their companies (including DFW,

22   although Akkelquist and DFW dispute its involvement, as described below). Russell avers 10

23   claims for relief, from RICO to breach of contract to unfair business practices. A circular firing

24   squad of mutual recriminations ensued. There have been crossclaims and counterclaims and third-

25   party defendants, to say nothing of the many other motions in this case. Maman claims Shlomo

26   falsely denigrated his capabilities to Russell, causing Russell to fire him. *See* First Amended

27   Third-Party Complaint. Maman also claims Shlomo breached the contract between them and

28

United States District Court
Northern District of California

1  committed fraud by lying to drum up work for himself and not delivering the contracted-for

2  security personnel. Maman also sued Russell for the money he allegedly owes for security

3  services, *See* First Amended Counterclaim. Shlomo, for his part, sued Russell for unpaid fees and

4  indemnification. *See* Crossclaim. (Russell did not sue Shlomo.) This order deals only with a subset

5  of the claims, as only DFW and Shlomo have brought MSJs.

6        **D.  DFW's Role**

7        Although briefly mentioned above, the involvement of DFW Metroplex Training Academy

8  requires further explanation, as it is one of the parties that bring a MSJ.[1] DFW is a firearms and

9  security training facility in the Dallas-Fort Worth area. Deposition of Mary Bull at 124 (deposition

10  page number, as used throughout). It is a sole proprietorship owned by Mary Jane Bull, a retired

11  police officer. *Id.* (Thus, DFW and Bull are interchangeable for purposes of this order.) According

12  to DFW, it provides no service other than training. *Id.* at 45. (Russell interprets the DFW website

13  to have been advertising security services by posting the biographies of Akkelquist and Maman.)

14  Bull was interested in branching out into other areas. She met Akkelquist through her sister, and

15  learned he had expertise in terrorism-related topics. They discussed the possibility of his giving

16  lectures in this area, seemingly under the auspices of DFW's training program. Thus, they put his

17  resume on the DFW website. *Id.* at 47. Akkelquist was also given a DFW email address. *Id.* No

18  lectures, however, were ever given.

19        According to DFW, its sole involvement in this saga is that it did Akkelquist's

20  bookkeeping for his Russell-related work. *Id.* at 57, 81. Akkelquist knew Bull did bookkeeping as

21  part of DFW's regular operations. According to him and DFW, he asked her to do the billing,

22  seemingly in part because he thought it was necessary or superior for the funds to go to a business

23  account, and she had experience in business recordkeeping. Invoices were prepared on DFW

24

25  [1] DFW accompanied its 20-page motion with a 9-page table of "undisputed facts," separate from the required supporting affidavit. This violates Local Rule 7-2(b), which requires motions be no more one document of 25 pages or less. Russell mimicked the form with a response to each fact—

26  some of which are disputed after all. Strict compliance with the Rule will be waived for purposes of this motion, but counsel are reminded to follow its requirements faithfully in the future.

27

28

letterhead and sent to Russell or his agents. Russell would then pay the invoices, and Bull would distribute the money to people as directed by Akkelquist, including his wife, Micheletti, Houssain El Ayle, Nader Abusazolof, and Bull's sister. *Id.* at 59, 103. In return for these services over nine months, DFW was paid $8,474.53. *Id.* at 67, 104. At no time did Bull or DFW do any work for Russell, directly or indirectly, or even communicate with him. According to Bull, she did not even know what the invoices were for, and never talked about Russell at all. *Id.* at 59–62, 117–119. This is confirmed by Russell and Akkelquist. Russell Depo. Vol. 1 at 13; Akkelquist Depo. at 233.[2]

Russell disputes DFW's characterization of its role, arguing that DFW's advertising for Akkelquist and Maman and its invoicing and disbursing money means it was an integral player in the scheme from start to finish. Russell notes that Akkelquist referred to DFW as "our company" in an email with Russell's financial agent and Bull, as well as maintaining a DFW email address, so Russell believed he was part of DFW, or perhaps a part owner. In the TAC, Russell claims he went to DFW's website before hiring Akkelquist. On the other hand, in his deposition, he acknowledges he does not have a specific memory of this, but merely believes he would have done so. Russell Depo. Vol. 1 at 10. Finally, Russell also notes Bull consciously tried to minimize her knowledge of Akkelquist's project with Russell. Specifically, Bull said, "the less I knew, the less I could get in trouble," although she explained that was because "security-type work" is "need to know." Bull Depo. at 61–63.

**E.  Shlomo's Role**

Ronen Shlomo also brings two MSJs. Shlomo and his company Bsecure provided physical security for Russell as a subcontractor to Maman. They bring a MSJ against both Maman and Akkelquist, and another against Russell. Shlomo was hired as a subcontractor for close physical protection at a rate of $600 per person per day, later increased to $700. These are reflected in

---

[2] Russell was deposed over two days in this case; the citations to his deposition in the sections relating to DFW come exclusively from the first day of his deposition, referred to as Volume 1.

written contracts, and a non-disclosure agreement. These agreements did not specifically require that the personnel be licensed as security providers.

Maman claims Shlomo told Russell that Maman was not performing his duties as promised; that Maman had exaggerated the threats Russell faced; and that Maman had lied to him. This supposedly led Russell to fire Maman and hire Shlomo directly. Maman also argues Shlomo made two fraudulent misstatements: (1) he said an investigative report Maman had commissioned was inadequate, so that Maman would pay Shlomo to redo it, and (2) he would provide agents who were licensed in California and lived there.

In his defense, Shlomo points to Russell's deposition testimony that he fired Maman because of his lies about the contracts. Russell Depo. Vol. 2. at 132. In fact, Russell explicitly said in his deposition that his firing Maman had nothing to do with Shlomo. *Id.* at 141, 147. He also said the licensing issues Maman complains about were unimportant. *Id.* at 142. Shlomo also points out that even Maman's own deposition points to a different cause for his termination. Maman testified he thought he was fired because he would not indulge Russell's paranoid fantasies and have his guys "tear [his] place apart." Maman Depo. at 246–49. Finally, Shlomo sent Maman requests for admission covering much of this ground, to which Maman did not respond, thereby operating as an admission. Fed. R. Civ. P. 36(a)(3). (Maman also did not respond to Shlomo's MSJ on Maman's third-party complaint.)

After Russell fired Maman, he briefly hired Shlomo directly. Russell said in his deposition this was largely to "cross-examine" Shlomo about the affair. Russell also agreed to indemnify Shlomo for any costs arising out of his services. This was specifically written and understood to include lawsuits, such as Maman suing Shlomo. Shlomo. Decl., Ex. 1, Agreement, at 6; *see also* Russell Depo. Vol. 2 at 155–59. There was a written agreement for $87,500 for services rendered, unpaid through the present, and 1.5% monthly interest on unpaid bills, currently amounting to just over $50,000. Shlomo served a request for admission on Russell, to which he did not respond, resulting in an admission of those facts. Graft Decl. ISO MSJ as to Cross-Complaint at 2.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The non-moving party must then offer evidence of such a caliber that 'a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient.'" *United States v. Wilson*, 881 F.2d 596, 601 (9th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "The deciding court must view the evidence, including all reasonable inferences, in favor of the non-moving party." *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017).

### IV. DISCUSSION

#### A.  DFW

Russell charges DFW with all 10 counts in his Complaint; the undisputed facts reflect that he cannot prevail at trial on those claims. This is largely because DFW's owner, Mary Bull, offered undisputed testimony that her only involvement with Russell was indirect and minimal. Russell's counsel admitted at oral argument there is no evidence Bull intended to defraud Russell. Thus, there is no genuine dispute as to the material facts which entitle DFW to judgment on nearly all of Russell's claims. While Russell has a stronger argument for his Unfair Competition and professional negligence claims, which do not require intent, the evidence shows there too that DFW is not culpable for the harms he has endured.

##### 1.  Fraud Claims

First, Russell accuses DFW of fraudulent misrepresentation, concealment, and false promise. Each of these sound in fraud, and require a material misrepresentation made with knowledge of its falsity and intent to defraud, along with reasonable reliance by the defrauded

United States District Court
Northern District of California

party. Cal. Civ. Code § 1710; *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 974 (1997). Russell bases these claims on various representations made to him, e.g., that his life was under threat. Yet, none of these legal concepts or representations apply to DFW in the slightest. True, Russell was sent Akkelquist's invoices on DFW letterhead. Yet those were not representations by Bull—they were representations by Akkelquist. Bull had no communications with Russell. Thus, she could not have misrepresented anything to him, let alone had an intent to deceive him. *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith*, 68 Cal. App. 4th 445, 482 (1998). At most, she "represented" to Russell that she and Akkelquist were linked, which is immaterial here.

DFW's website also does not provide a basis for these claims. Even if Maman's and Akkelquist's biographies were misleading—their true career history is still unclear—there is no evidence Bull was anything but an unwitting victim of their deceptions. Bull did not intend to defraud anyone, let alone Russell specifically. Finally, it is unclear whether Russell even looked at DFW's website before hiring anyone. In his deposition, he said he could not remember doing so, but assumed he would have.

The lack of intent by DFW to do anything to Russell also entitles DFW to judgment on Russell's Intentional Infliction of Emotional Distress claim. The same logic also applies to the RICO claim, as DFW did not have the requisite "common purpose" to commit any crime. *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

### 2. Contract, Unjust Enrichment, and Common Count

DFW also deserves judgment on Russell's breach of contract claim, as Russell himself acknowledges, because there was no agreement between them. Opp'n at 12. Yet Russell persists in alleging that DFW was unjustly enriched. To prove this claim, Russell would need to show DFW was unjustly enriched at the expense of another. However, the circumstances must be such that it would be unjust for the enriched person to retain the benefit, based on the relationship between the two parties. *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1662–63 (1992). Here, there was no benefit conferred from Russell to DFW in the first place, and there is nothing unfair about

United States District Court
Northern District of California

1    their indirect relationship. Akkelquist paid DFW's fees, not Russell. Russell only "paid" DFW in

2    that DFW passed along money from Russell to others. Still, Russell argues it was only

3    Akkelquist's money through fraud, so it would be unjust for DFW to retain it. Unjust enrichment

4    does not sweep so broadly, and does not operate as a catchall asset forfeiture law through which

5    victims of fraud can recover funds from anyone the defrauder has paid. If Akkelquist used

6    Russell's money to buy a copy of a software program, which he then used to create more invoices

7    to send to Russell, Russell could not recover from the software provider. Neither can he recover

8    from DFW for its bookkeeping. (Russell does not address the parallel "common count" claim but

9    it sinks with these two.)

### 3.  Unfair Competition and Negligence

11       Russell has better arguments for why his Unfair Competition and professional negligence

12   claims should survive summary judgment, but ultimately these claims too can now be adjudicated

13   in DFW's favor. First, as to the Unfair Competition claim, it may well be that Akkelquist's and

14   Maman's biographies were misleading, which would seemingly constitute a genuine dispute of

15   material fact as to whether DFW's website contained misleading advertising. Cal. Civil Code §

16   17200. Yet DFW indisputably was not advertising its services as a security provider or consultant.

17   DFW advertised Maman and Akkelquist as instructors. Thus, they were not advertising the

18   services Russell purchased from Maman or Akkelquist—and he did not even engage them through

19   DFW. Russell's claim is further undermined by his own testimony that he did not remember going

20   to DFW's website before hiring Maman and Akkelquist. There is simply no evidence he became

21   aware of DFW before hiring Maman and Akkelquist, rather than learning of them afterwards

22   through Akkelquist's invoices. In combination, these two defects mean Russell cannot claim he

23   was harmed by any misleading advertising on DFW's site.

24       To prove his professional negligence claim, Russell must show DFW owed a duty to him,

25   a breach of that duty by not using similar skill or diligence of those in its profession, and that the

26   breach was a proximate cause of actual loss or damage to him. California Standard Jury

27   Instruction 600; *Budd v. Nixen*, 6 Cal. 3d 195, 200 (1971). Professional negligence is no different

28

ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT
CASE NO.  18-cv-06691-RS

than traditional negligence for purposes of this case; the profession merely helps shape the duty of care. *Evans v. Hood Corp.*, 5 Cal. App. 5th 1022, 1050 (2016); *Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 8 Cal. 4th 992, 995 (1994). Professional negligence is not limited to the most clearly defined professions, such as architects or lawyers, and there need not be privity between the professional and the plaintiff. *Beacon Residential Cmty. Assn. v. Skidmore, Owings & Merrill LLP*, 59 Cal. 4th 563 (2014). Yet, Russell must first establish that DFW owed a duty to him, which he cannot do. The general rule is there can be no recovery for negligently inflicted purely economic losses unless plaintiff and defendant have a special relationship, e.g., plaintiff was under defendant's care in a prison or nursing home. *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 400 (2019). (Russell's claims of non-economic damage, e.g., his emotional distress claims, cannot be fairly traced to DFW.) There is no reason to depart from that general rule here, because there is no dispute that DFW lacked any special relationship with Russell, and policy reasons do not compel otherwise. *See Beacon*, 59 Cal. 4th at 581; *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 771 (2011).

DFW is also entitled to summary judgment on this claim because Russell cannot show its actions were the proximate cause of his damages. Instead, the allegedly fraudulent acts by other Defendants are so extreme that they are an unforeseeable intervening cause. *See Collins v. Navistar, Inc.*, 214 Cal. App. 4th 1486, 1506 (2013). Given DFW did not intend for anyone to use the biographies to purchase security services in the first place, the chain of events here simply cannot supply proximate cause. While the foreseeable harm from embellished biographies might include clients receiving less experienced professional services than they had paid for, or being overcharged (because the embellishment shows a tendency to lie), DFW could not reasonably foresee that posting biographies it had not fully vetted would lead to the alleged fraud here. The same goes for its bookkeeping services: it did not owe a duty to Russell in the first place, and beyond that those actions were not the proximate cause of his damages.

### B.  Maman's Claims Against Shlomo

Shlomo brings two summary judgment motions. First, a MSJ on Maman's Third-Party

1    Complaint. Maman alleges four claims for relief against Shlomo: breach of oral contract,

2    interference with contract, indemnity, and fraud. Shlomo presents evidence that rebuts each of

3    Maman's claims, while Maman did not respond to Shlomo's motion. *See* Reply at 2 (noting no

4    opposition filed). Even before that, Maman effectively admitted he did not have evidence to

5    support his claims against Shlomo by not responding to requests for admission. *See* Mot. at 17,

6    discussing Requests for Admission at 6. This helps explain why Maman's counsel represented at

7    oral argument on his motion to withdraw that Maman did not wish to oppose this motion. Thus,

8    even making all justifiable inferences in Maman's favor, there are no genuine disputes as to the

9    relevant material facts, and Shlomo is entitled to judgment on all of Maman's claims against him.

10   *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

11       Taking each claim in turn, beginning with breach of contract, Maman argues Shlomo

12   breached an oral contract by failing to provide timely reports. Shlomo affirms that the contract

13   included no reporting requirements, only close physical protection services. Shlomo Decl., Ex. A.

14   Even if Maman had provided evidence to challenge Shlomo's, the lack of reports could not have

15   caused the damage Maman claims (his firing). Russell had clear reasons for firing Maman, none of

16   which had anything to do with Shlomo. Russell testified he fired Maman because he felt conned.

17   He specifically testified it was not because of anything to do with Shlomo. Russell Depo. Vol. 2 at

18   141. Even in his own deposition, Maman did not cite Shlomo's supposed interference when

19   testifying about why he had been fired. Maman Depo. at 246–49. The interference and indemnity

20   claims also fail in large part because Shlomo did not cause Maman's firing.

21       Finally, Maman's fraud claim has been disproved by discovery. Russell testified that he

22   did not care a whit about licensing. Russel Depo. at 142–44. Evidence also shows Shlomo did in

23   fact prepare a more in-depth background report; that Maman was paid by Russell for it; and

24   Russell did not fire him because of the duplicate report. Shlomo Decl., Exs. B and C; Maman

25   Depo. at 230–35; Russell Depo. Vol. 2 at 141.

26       **C.  Shlomo's Claims Against Russell**

27       Shlomo seeks to enforce his contract for security services and indemnification against

United States District Court
Northern District of California

1    Russell because he was not paid for his services or for his costs defending Maman's lawsuit.

2    Russell did not pay Shlomo directly for his services. Russell Depo. Vol. 2 at 151–52. The only

3    dispute here is whether Russell intended to have the money he paid to Maman also cover

4    Shlomo's invoices. However, this appears to be an argument contrived for litigation, rather than a

5    genuine dispute. It defies belief to think Russell intended the payments he made to Maman to

6    cover the separate contract he signed with Shlomo after he fired Maman for conning him. Russell

7    was well aware he might not get that money back, and that he was siding with Shlomo against

8    Maman. *Id.* at 158. This is established by the undisputed fact that Russell intended to indemnify

9    Shlomo against any future suit against him by Maman. *Id.* at 159–60.

10        Faced with an unexcused failure to pay on an enforceable contract, Russell made no

11   response to this motion. Nor did he respond to Shlomo's Requests for Admission. Graft Decl. ISO

12   MSJ as to Cross Complaint at 2. Finally, at oral argument, his counsel said he does not oppose this

13   motion except as to the amount of damages, specifically interest. However, the evidence is clear

14   that the contractual damages and interest are owed. Shlomo is entitled to judgment on his claims

15   against Russell. *Masson*, 501 U.S. at 520.

16                                    **V. CONCLUSION**

17        For the reasons set out above, DFW's MSJ and Shlomo's two MSJs are granted.

18

19   **IT IS SO ORDERED**.

20

21   Dated: February 11, 2022

22                                    _____

23                                    RICHARD SEEBORG
                                      Chief United States District Judge

24

25

26

27

28                                              ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT
                                                CASE NO. 18-cv-06691-RS

                                            13